HEARD NOVEMBER TERM, 1877.

## SINGLETON *vs.* LOWNDES.

It is a breach of trust to invest trust funds upon the security of encumbered property where it is probable that the trust estate will be called upon to redeem.

Investment of trust funds in personal security merely can only be sustained by proof of the necessity and prudence of such investment.

An investment of trust funds upon the security of a mortgage of land and negroes sustained, though part of the property was subject to prior encumbrances.

Slaves, it seems, especially those engaged in agriculture, when included with the land in the same mortgage, were a real and not a personal security.

Confederate currency was not money in a legal sense, but a commodity to be taken at its actual value. It was, therefore, a breach of trust to convert a trust security into such currency at its nominal value.

A trustee who committed a breach of trust by turning over trust funds to a tenant for life *held* not to be entitled to commissions.

### BEFORE REED, J., AT CHARLESTON, MAY, 1876.

This was an action of Martha R. Singleton against Charles T. Lowndes.

The case was referred to Charles H. Simonton, Esq., as Referee, and will be fully understood from his two reports therein.

The first report is as follows:

The case, as made out in the pleadings and by the evidence, is as follows:

The plaintiff is the niece of the defendant, being the only child of his sister, Mrs. Mary I'on Kinloch.

On 21st of March, 1816, a marriage settlement was made between Frederick Kinloch and Mary I'on Kinloch, to which Cleland Kinloch and Jacob Bond I'on were trustees, whereby certain property was settled to the joint use of the husband and wife during their joint lives, then to the survivor for life, and at the death of the survivor to the issue of the marriage then living, in fee. Cleland Kinloch, one of the trustees, departed this life, and in 1837 proceedings were had in the Court of Equity whereby the surviving trustee was discharged, and the defendant, Charles T. Lowndes, was substituted as trustee under the settlement in his stead.

It further appears that Thomas Lowndes, the father of Mrs. Kinloch, departed this life in July, 1843, leaving in force his last will and testament, whereby he gave and bequeathed certain property to his sons, Rawlins Lowndes and Charles T. Lowndes, and his son-in-law, William Aiken, in trust for the sole and separate use of his daughter, Mary I'on Kinloch, for life, with power of appointment thereof by an instrument under her hand and seal, to take effect during her life, or by an instrument in the nature of a last will and testament, to take effect after her death, and in default of such appointment to her issue living at her death in fee. Rawlins Lowndes and William Aiken declined to accept the trusts, which, however, were assumed by the defendant, Charles T. Lowndes. He took charge of the trust estate and has administered it.

Frederick Kinloch died in August, 1856, and Mrs. Mary I'on Kinloch on 29th of September, 1865. The plaintiff is the sole surviving issue of the marriage. She has been a widow for many years.

Upon the death of her mother she was not aware of the existence of the trusts, and being under the impression that the property from which her mother had derived her income was her absolute estate, she, with the advice and assistance of the defendant, applied for and obtained letters of administration on the estate of her mother and took charge of the assets. She soon found that the choses in action stood in the name of the defendant, and that his assignment of them was necessary. Being thus put on the inquiry, she examined more carefully among the papers left by her mother, and, with the aid of counsel, for the first time became aware of the existence of the trusts and of the fiduciary character which the defendant bore to her. She has filed her complaint calling him to an account for his actings and doings as trustee.

The answer of the defendant admits that he was trustee both under the marriage settlement and the will, and asserts that he managed the estate with care and advantage. It avers that in 1855, at the request of Mrs. Kinloch, the life tenant, he transferred to her agent, Mr. Petigru, assets of the trust estate to the value of nineteen thousand three hundred and forty-seven 78–100 dollars, and that on the 3d July, 1855, he transferred the remaining assets of the trust estate, under the direction of Mrs. Kinloch, to Adams & Frost, the factors and agents of the plaintiff, and that these gentlemen received them for Mrs. Kinloch. It insists that this transfer divested him of his office as trustee. The answer does not assert positively that this was effected with the consent and concurrence of the plaintiff, but it claims that the transfer of the assets was made to Adams & Frost with her sanction. He admits that afterwards, at the request of Mrs. Kinloch, he did receive the assets from Adams & Frost, but he insists that this was in the character of her agent, and only from motives of kindness and affection for her. The answer further states that on 30th January, 1865, the defendant fully accounted with Mrs. Kinloch for these assets so held by him as her agent; that she received them and ratified and confirmed his acts.

While, however, denying his liability to account, the answer proceeds to detail the investments made by him so far as he is able to do so without his books, which were destroyed during the war, and he justifies these investments in every instance. He maintains that, even if his position was that of a trustee, he has "administered the trust, not only faithfully and honestly, not only with prudence and care, but with zeal and skill, and that the losses which have befallen the estate are the result of extraordinary events which no trustee could be held to anticipate or to provide against."

He files this account:

Funds in his hands in 1853, which constituted the value
   of the only assets he ever had as trustee, and exceeded
   the sum originally received, the excess growing out of
   his administration of the estate. .......................... $42,434 78
Less amount transferred to Mr. Petigru in 1855.......... 19,347 78

            Balance. ............................................. $23,087 00

Transferred to Mrs. Singleton, the plaintiff:

Bond of Mr. Thomas Milliken, secured by mortgages
    of realty and of slaves................................ $10,000 00
Bond of J. P. Earle............................................. 5,000 00
Bond of W. B. Pringle........................................ 7,787 00
Confederate bond in the hands of C. T. Lowndes......... 300 00

                                     $23,087 00

Both parties have testified. No claim whatsoever is made for the sum of $19,347.78 transferred to Mr. Petigru. The plaintiff ratifies this, because the transfer was made to pay the debts of her husband. She, however, positively denies that the assets were transferred to Adams & Frost with any intent or agreement to release the defendant from his duties as trustee. She denies that she had knowledge of the trust, and denies that the transfer was in any sense her act. I am of the opinion, from the evidence, that the plaintiff was not aware of the existence of her interest under the trusts of the settlement and of the will, and that she cannot be held as sanctioning the act of the life tenant. In any event, I am satisfied that some more formal and solemn act is necessary to discharge a trustee than that stated by the defendant; and it is also clear that the action of the life tenant could not divest the rights of the remainderman under the provisions of the instruments creating the trusts, such remainderman taking under these instruments independently of the life tenant.

The plaintiff objects to the account as erroneous and attacks some of the investments as irregular, insecure and improper.

As to the account:

A letter of the defendant, dated 29th October, 1853, addressed, it is said, to the late Thomas L. Wragg, the near relative of the defendant, and of Mrs. Kinloch, gives a statement of the trust estate at that time, as follows:

Bond given by the father of the defendant for the pur-
    chase of all the property of Mr. and Mrs. Kinloch
    upon their separation............................ .............$15,000 00
This having been paid in full was invested in the United
    States loan of 1847......................................... 14,700 00
Add premium on loan 2 per cent............................. 300 00

                                       $15,000 00

In 1858 the United States Government called in the loan, giving a premium as follows:

| | | |
|---|---:|---:|
| Amount of principal | $14,700 | 00 |
| Premium | 3,087 | 00 |
| | $17,787 | 00 |

Invested as follows:

| | | |
|---|---:|---:|
| Bond of Thomas Milliken, secured by E. P. Milliken, on mortgage of plantation and slaves on Cooper River | $10,000 | 00 |
| Bond of J. J. Pringle, secured by W. B. Pringle | 5,050 | 00 |
| Bond of the same.: | 2,737 | 00 |
| | $17,787 | 00 |

| | | | | |
|---|---:|---:|---:|---:|
| Under the will of her father Mrs. Kinloch had a legacy | $10,000 | 00 | | |
| Also a further sum given her for the bequest of Mrs. Champneys | 6,550 | 00 | | |
| This last was invested in United States bonds and was sold at a premium | 797 | 00 | | |
| | $17,347 | 00 | | |

Invested as follows:

| | | | | |
|---|---:|---:|---:|---:|
| Bond of Manigault | $3,000 | 00 | | |
| Bond of Alfred and Benjamin Huger | 2,550 | 00 | | |
| Bond of Joseph and D. E. Huger | 2,450 | 00 | | |
| Bond of J. J. and W. B. Pringle | 2,263 | 00 | | |
| (All secured.) | | | | |
| Amount left with Herckenrath, Wragg & Co. to be invested | 7,082 | 00 | | |
| | | | 17,347 | 00 |

Besides these, Mrs. Kinloch had 18 shares in the State Bank, also half interest during the life of Mr. Kinloch in 53 shares,—one-half going to her credit and the other half for the benefit of other parties. The letter estimates this at.................. ........ ............. 8,000 00

Total.................................................... $43,134 00

Another paper was introduced in evidence bearing on this subject. It is an envelope of the kind used for holding large papers. On this is endorsed, in the handwriting of the defendant, the following words and figures:

1861.

Property of Mrs. Kinloch:

| | |
|---|---:|
| Thomas Milliken bond............................................ | $10,000 00 |
| W. B. Pringle bond.............................................. | 7,787 00 |
| | $17,787 00 |

Originally joint property of Mr. and Mrs. Kinloch. State Bank stock not paying good interest, sold and invested as follows:

| | |
|---|---:|
| James P. Earle.................................................... | $5,000 00 |
| Alfred and Arthur Huger...................................... | 2,383 00 |
| | $7,383 00 |

Of the Huger bond, the same paper says: "Delivered to D. Lesesne, to receive payment in Confederate stock."

To this is added a statement of other assets received from estate of Col. I'on, with which the case has no connection.

From these memoranda it would appear that in 1861 the defendant had in his hands for the trust estate:

| | |
|---|---:|
| Bond of Mr. Milliken......... ..................... ...... | $10,000 00 |
| Bond of Mr. Pringle............................................ | 7,787 00 |
| Bond of J. P. Earle............................................. | 5,000 00 |
| Bond of the Messrs. Huger, afterward put in Confederate bonds....................................................... ... | 2,383 00 |
| | $25,170 00 |

As to the investments:

The plaintiff objects to three of these:

| | |
|---|---:|
| The bond of Mr. Milliken.. ..... .. ...........................$ | 10,000 00 |
| The bond of Mr. Earle.......................................... | 5,000 00 |
| The bond of the Hugers, and its investment in Confederate bonds......................................................... | 2,383 00. |

Thus far the evidence and argument have been directed to the last two.

The Earle bond:

With regard to the Earle bond, the defendant, in his answer, which he adopts as a part of his testimony, says: That when he lent the money to Earle he took from him, as security, his bond for the amount, ($5,000,) and a mortgage of certain real estate in the city of Charleston, and of six negro slaves; that the real estate was worth, at the lowest valuation, $6,000, and the slaves, who were, as he believes, trained mechanics, were worth, at a moderate estimate, $7,200. The testimony of several witnesses shows that these valuations were not excessive. The defendant also says, in his answer, that at the date of the loan Earle "was a person enjoying excellent credit in Charleston with the mercantile community, and particularly with the banks, and so impressed was the defendant with this that he would not have felt any uneasiness in lending that sum of money to Earle from his own means." In corroboration of his testimony respecting Earle's credit the defendant has called witnesses to speak to it, and also introduces in evidence a statement from the books of the Bank of Charleston, of which the defendant was at the time a leading director, showing that at that period the bank had discounted paper, on which Earle was maker or endorser, for nearly $100,000, and, beside this, had accepted him as surety on the bond of one or more of its agents.

Upon examining the bond, it appears that it was intended to serve a double purpose, not only as an investment but also the protection of the defendant himself against sundry endorsements for Earle. There can be no doubt that the defendant thought the investment a good one. I apprehend, however, that although we may be satisfied that the trustee had perfect confidence in the safety of the investment, we are not thereby precluded from examining into the grounds of his confidence or from inquiring into the steps which he took in order to satisfy himself. The investment must not only be such as a prudent man would make; it much be such as a prudent man, exercising prudence, had made. As Chief Justice Moses says, in *Mayer* vs. *Mordecai*, (1 S. C., 394,) "what will constitute the care and diligence" exacted from a trustee "will depend on the attendant circumstances. If the act itself was an incautious and imprudent one, it will not be sustained, and no aid derived from the fact that the trustee was countenanced in it by the participation of prudent men will give it sanction or support."

There can be no question as to the ability, sagacity and prudence of the defendant in the management of his own affairs. Upon ex-

amining into the mortgage, we find that the real estate was a lot on Calhoun street in this city. On this lot it appears from the evidence that there was a row of small houses, rented principally to colored persons, a class of houses commanding a rent much disproportioned to their selling price. The property cost Earle on its purchase $6,000. At the date of the mortgage there was an existing valid lien on all the property of Earle in the shape of a judgment in favor of Thomas O'Brien, on which was due $11,445.83. This judgment had been obtained on a bond given by Earle for the purchase of the Mills House stables in Chalmers street, a valuable property, which cost Earle eighteen thousand dollars, and was then owned by him, and bore date April 19, 1856. Earle owned other parcels of real estate, more or less under mortgage. The testimony shows that he owned real estate, at cost prices..............$73,460 00
Amount of mortgages, including those to C. T. Lowndes,

> trustee....................................................... 40,280 00

> Surplus........................................... $32,180 00

When this mortgage was given there was on record, not marked satisfied, another mortgage of the same property for five thousand dollars, which, however, was in fact paid; it does not appear that the defendant was aware of the existence of this mortgage. It appears from the evidence that when the defendant accepted the security he was under the impression that he was receiving a mortgage of a lot on Calhoun street more valuable than this on which was Mr. Earle's residence. The slaves mortgaged were all males—mechanics—and would, if sold, have commanded high prices, as much as two thousand dollars each. The mortgage was dated 22d May, 1860, and, as far as appears from the evidence, was executed on that day. It was recorded in the office of Register of Mesne Conveyance and in that of the Secretary of State, on 28th July, 1860, more than sixty days after the execution. At that time Earle was in full business, owed debts, and contracted debts afterward.

Earle died soon after the end of the war. His estate, greatly diminished by the emancipation of slaves and by the results of the war, was settled in this Court.

The debts proved against his estate were.................... $66,031 85
The gross assets were............................... $16,409 00
Less costs, taxes, etc.............................. 3,808 87
                                          ———————— $12,600 13

In fact, the assets were not sufficient to pay two mortgages held by other persons and O'Brien's judgment. The plaintiff succeeded in collecting from Earle in his lifetime, on this bond, the sum of five hundred dollars on 4th May, 1867, and a further sum of five hundred dollars on 9th September, 1867. The balance upon the bond can never be paid.

From this statement it appears that the defendant, as trustee, lent trust funds upon the security of a mortgage of real estate, supposing at the time that the lot mortgaged was another much more valuable than the one really bound by the lien; that he lent upon it a sum of money five-sixths of its cost value; that he accepted it with a valid subsisting lien upon it of $11,445.83, and with a cloud upon its title in the shape of a mortgage for five thousand dollars, unsatisfied on the record; that he strengthened the security with a mortgage of six slaves—all of them males—who could not increase in value, and were exposed to diminution in value from death, disease or casualty; that by failure on his part to record the mortgage within sixty days, it became void as against creditors, and that Earle was the customer of the Bank of Charleston, of which defendant was a director, and at the time of the loan and afterwards was under obligations to the bank in the sum of nearly one hundred thousand dollars.

The Huger bond:

We now come to the investment of the proceeds of the Huger bond in Confederate bonds.

On this point, referring, however, only to the investment of a sum of $300, the defendant says that they were "bonds bought in the market in the ordinary way of business, and were not taken in aid of the Confederacy;" that he acted in accordance with the views and with the approval of Mrs. Kinloch; that, also, he acted in accordance with the known opinions of the plaintiff, who was conspicuous in her devotion to the cause of the Confederacy,—had herself accepted payment of debts in Confederate notes, and had censured the conduct of other persons who refused to receive payment in these notes. In his testimony he confirms these statements of his answer.

Besides this, he proves that both of the obligors on the Huger bond were reduced to insolvency by the result of the war.

On the other hand, the plaintiff introduced in evidence the testimony given by the defendant, as a witness in a cause entitled

*Lowndes* vs. *Robertson et al.*, tried in this Court, in which he stated that during the war he would not make a sale of certain realty, the inheritance of his wife, until he had first provided the means of investing the proceeds of such sale in other than war securities; that he had refused to invest the money of his wife in such war securities, preferring to put the investment in obligations payable in good money after the war.

There is no evidence that when the original loan was made of the trust money to the Hugers any other security or evidence of debt was taken by the trustee than their personal bond.

I respectfully report as my finding on questions of fact:

I. That the defendant was duly appointed trustee of Frederick Kinloch and Mary I'on Kinloch, his wife, under the marriage settlement of 1816, by way of substitution in the place of the surviving trustee, and that he accepted the trust.

II. That under the terms of this settlement the property was held for the use of the husband and wife during their joint lives, then of the survivor for life, and at the death of the survivor, for the use of the issue of the marriage, in fee.

III. That the plaintiff was the sole surviving issue of the said marriage and the only person entitled to demand an account from the trustee.

IV. That the defendant, with others, was duly appointed the trustee of Mrs. Mary I'on Kinloch under the will of her father, Thomas Lowndes; that he alone accepted the trust.

V. That under the terms of this trust the property was held to the sole use of Mrs. Kinloch during her life, with power of appointment by deed or will, remainder in default of such appointment to her issue living at her death.

VI. That Mrs. Kinloch departed this life on 29th of September, 1865, without having exercised her power of appointment, leaving the plaintiff her sole surviving child.

VII. That the defendant has never been discharged or released by the plaintiff from liability to account to her as trustee under the deed of settlement and the will aforesaid.

VIII. That of the capital originally in the hand of the trustee, the plaintiff ratifies and confirms the expenditure of $19,347.78.

IX. That the capital of the trust estate in the hands of the trustee was the sum of twenty-five thousand one hundred and seventy dollars, and for this he must account.

X. That a part of this sum is an investment in the bond of J. P. Earle for ($5,000) five thousand dollars, secured by a mortgage of a lot of land in Calhoun street and of six slaves.

XI. That the security for the bond was insufficient, the mortgage recorded after the time allowed by law, and void as to the creditors of Earle, of whom there were many then in existence and subsequent thereto, and that the investment was not made by the trustee with necessary prudence and care.

XII. That a portion of this capital was invested in the personal bond of Alfred Huger and of Arthur Huger for two thousand three hundred and eighty-three dollars, without further security.

XIII. That this bond was paid to the trustee during the war, presumably in Confederate treasury notes, and that these notes were invested by the trustee in Confederate bonds purchased in due course of business and not with intent to aid the Confederacy.

XIV. That Alfred Huger and Arthur Huger were made insolvent by the results of the war.

XV. That the plaintiff, of full age and *sui juris*, lived during the war within the limits of the Confederacy, sympathized with its cause, made use of Confederate money, received it in payment of dues to her, and disapproved and condemned the conduct of others in refusing so to receive it.

XVI. That the defendant refused to make sale of certain property of his wife until he had secured the investment of the proceeds of sale in certain securities, payable after the war in good currency, and for such proceeds refused to accept securities payable during the war.

As conclusions of law:

I. That the defendant must account to the plaintiff for his actings and doings as trustee.

II. That in the account filed by him he has failed to justify the investment in the bond of J. P. Earle of $5,000.

III. That he must pay the plaintiff the amount invested in this bond, with interest from the death of the life tenant, that is to say, the sum of five thousand dollars, less the sum of five hundred dollars paid on 4th of May, 1867, and of five hundred dollars paid on 9th of September, 1867, calculating interest from 29th of September, 1865.

IV. That inasmuch as the breach of trust arose from want of prudence and care and was not willful, as the trustee did not

use the trust fund for gain or for his own purposes, or employ it in trade, and as there was no direction in the instrument creating the trust that the increments of interest should accumulate, it would not be proper to charge the trustee with annual rests, and he is liable only for simple interest.—Perry on Trusts, 432, 433; *Wright* vs. *Wright*, 2 McC. Ch., 202; *Myers* vs. *Myers, ibid*, 266; *Baker* vs. *Lafitte*, 4 Rich. Eq., 394.

V. Before stating the conclusion of law which I have reached upon the facts connected with the Confederate investment, I ask leave to state some of the difficulties which I encountered in coming to that conclusion. It appears to me that the cases which have been decided upon questions made as to such investments, especially those discussed before our Supreme Court, have all been attended by circumstances which do not exist in this case. In these cases the *cestui que trust* was either under age, or under disability, or absent from the limits of the Confederacy, and so were free from the taint of rebellion. In the present case the plaintiff was *sui juris*, resided within the Confederacy, and shared to the fullest extent in the hopes and purposes of her own people in the war.

After careful consideration, however, I am of the opinion that the broad principle laid down in our cases binds the Referee, and that a modification of this principle, if any will apply to this case, can only be made by the Court which will review his report.

*Mayer* vs. *Mordecai* (1 S. C., 383,) held it a breach of trust for a trustee to receive Confederate money upon a bond made before the war, and past due, secured by a mortgage of real estate.

In *Creighton* vs. *Pringle*, (3 S. C., 96,) a trustee was held liable to account for a bond, secured by a mortgage of slaves, made before the war, which he had permitted the obligor to pay in Confederate money and then invested the proceeds in Confederate bonds.

In both cases it was ruled that, inasmuch as the trustee was not bound to receive the Confederate money, he had no right to receive it.

In *Pickens* vs. *Dwight*, (4 S. C., 366,) Moses, C. J., uses this language, speaking of a breach of trust by a trustee in the change of an investment: "More especially would the breach be without excuse if the new security was of the class least favored by the Courts for investment, and it would be without the shadow of extenuation if the change was made for Confederate notes, which, when compared with gold and silver coin or national bank notes, had not

only a depreciated value, but one daily fluctuating with the probable success or failure of the government which had issued them, and, to any ordinary understanding, ultimately entirely worthless, unless the civil war which it was waging could resist the arms and powers of the United States which were brought into requisition for its suppression."

It may be said, however, that, inasmuch as the obligors were made insolvent by the results of the war, the trustee parted with a security which was valueless and the trust estate has lost nothing.   But this itself arose from a breach of trust.   A trustee has no right to invest the funds of a trust estate without security.   The trustee should not have placed the money of his trust estate in this bond without requiring other security.

In *Nance* vs. *Nance*, (1 S. C., 209,) Mr. Justice Willard made an exhaustive examination into this subject, and sums up the conclusion as follows:  "The trustee will be held responsible for losses of trust funds through loans to private persons, unless securities are taken collateral to such loans.   Such securities should primarily consist of mortgages of unencumbered real estate of a value sufficient to guarantee the debt against all contingencies liable to occur or capable of being foreseen.   Bonds of individuals should not be taken in lieu of real securities, unless unobjectionable investments cannot, in the exercise of reasonable diligence, be procured.   When personal securities are taken in lieu of real, it will devolve upon the trustee to make the necessity and propriety of such investment appear upon an accounting with the *cestui que trust*."

As a conclusion of law, I respectfully report that the defendant must account to the plaintiff for this sum invested in the Huger bond, to wit, two thousand three hundred and eighty-three dollars, ($2,383,) with interest from the death of Mrs. Kinloch, 29th September, 1865.

The testimony upon the Milliken bond has not yet been concluded.   Upon this branch of the case I ask leave to make a further report.

The second report is as follows:

At the conclusion of the preceding report I asked leave to make a further report upon the only one of the investments made by the defendant as trustee which had not been discussed.

The bond of Thomas Milliken:

On this point I have taken testimony and find these facts:

The defendant had invested fifteen thousand dollars, part of the trust estate in his hands, in the six per cent. loan of the United States, issued in 1847. In the year 1853 the United States, being desirous of calling in this loan, which was not yet due, offered to the holders a large premium as an inducement, amounting nearly to twenty-five per cent. of the principal. The defendant accepted the offer for the amount held by him. Of the sum received by him from the United States he invested ten thousand dollars in the bond of Thomas Milliken, with the personal security of E. P. Milliken, and secured his bond by a mortgage of North Mulberry, a rice planta- tion on Cooper River, and also by a mortgage of sixty-five slaves in families, working and residing on the said plantation. The bond was originally made by Mr. Thomas Milliken, in the year 1847, and the mortgages had been executed by him at that time. The defendant purchased the security in 1853, and he required the guaranty of Mr. E. P. Milliken. The latter was a merchant, doing business in Charleston, and, as the maker resided in the country, his guaranty was required in order to secure the prompt payment of the interest. The plantation mortgaged had been purchased by Mr. Milliken in 1836 for eighteen thousand ($18,000) dollars. There was due on the purchase money two bonds, one of twelve thousand dollars and one of six thousand dollars, both secured by a mortgage of the land. When the defendant purchased his securi- ties, the first named bond, that of twelve thousand dollars, was un- paid as to the principal, certainly to the sum of ten thousand ($10,000) dollars. The evidence does not show distinctly when the other bond, that of six thousand dollars, was paid. It came into the possession of Alexander Mazyck, as trustee of Mrs. Elizabeth Broughton, and on the death of Mrs. Broughton, in 1857, was transferred by him to her children. T. Alexander Broughton, one of these children, took an affidavit, dated 22d July, 1863, stating that this bond had been paid. He does not fix the date of pay- ment.

The interest on the bond in question had all been paid when the defendant purchased it, and was paid regularly afterward.

The defendant, in his answer and in his own testimony, says that the plantation was worth from twenty to thirty thousand dollars, and a witness of great accuracy, who has known the plantation for

many years before and after the war, concurs in this estimate of its value. Shortly after the end of the war the holder of the first mortgage foreclosed it, and the plantation sold for about seven thousand dollars. The slaves mortgaged to secure this debt, sixty-five (65) in number, were worth from five hundred to six hundred and fifty dollars each on the average. At the date of the loan and of the purchase of the security by the defendant, no apprehension whatever was felt in the community at large that the institution of slavery would be abolished at any early period. The emancipation of slaves, consequent upon the war, rendered the security valueless and made the estate of Thomas Milliken insolvent. I have no evidence as to the solvency of Mr. E. P. Milliken.

No testimony has been introduced as to the special circumstances under which the investment was made by the trustee. No evidence as to the necessity of this particular investment has been offered, and none as to its propriety, other than the value of the securities, has been adduced.

I have had no evidence that the trustee, either before or after the redemption of the loan by the United States, sought for the investment of the fund a mortgage of unencumbered real estate.

The only reason given for the sale of the public funds was the premium offered by the government, and the only motive given for the investment in the Milliken bond by the trustee himself is his conviction that it was an investment of the first class.

Upon these facts I respectfully submit my conclusion of law and the reasons which have led me to this conclusion.

The plaintiff makes two objections to this investment:

1. She contends that the trustee changed an investment already made in the public debt of the United States—the highest class of investments.

2. That he invested the money thus received in a bond, secured by an insufficient mortgage of real estate, and further secured by a mortgage of personal property, without any proof of the necessity or propriety of such investment.

As our conclusions upon the first objection will depend very much upon the result of our examination of the second objection, I will discuss the latter before addressing myself to the former.

The plaintiff relies upon the cases of *Nance* vs. *Nance* (1 S. C., 220,) and *Cureton* vs. *Wilson*, (3 S. C., 456).

There can be no doubt that if in these cases the learned Judges who delivered the opinions of the Court meant to include in the term "personal securities" all investments secured by a mortgage or pledge of personal property, and if they did not confine the expression to personal obligations, that is, to security on the names of persons, without any pledge or mortgage of property, the position of the plaintiff is sustained by very high authority.

Let us examine the cases. In *Nance* vs. *Nance* the suit was brought against the executors of a guardian seeking an account of the estate of the wards in the hands of their testator. It appeared that the estate, consisting originally of money and of choses in action, had been invested in the joint and several obligations of individuals, without further security, except in one instance in which a mortgage of realty was taken, which realty, however, was covered by liens prior to the mortgage. The Chancellor who heard the case on circuit sustained these investments.

The strict rule respecting the investments of trust estates prevailing in England had been greatly modified in South Carolina so as to suit the circumstances of this country, and the impression had grown up in the profession that want of good faith and gross negligence on the part of the trustee were the only grounds on which he could be held responsible in the event of the loss of trust funds. This impression had been deepened and intensified by the misfortunes which beset our people after the war and had extended itself to the bench. The Court, in *Nance* vs. *Nance*, demonstrated in an unanswerable argument that this impression was a false one, not sustained by any of the cases from which it was supposed to be derived.

On the contrary, the Court rule that it is the primary duty of the trustee to obtain a secure investment of the trust fund, secure against all contingencies liable to occur or capable of being foreseen. "The more difficult question," says Judge Willard in this able opinion, delivered by him as the organ of the Court, "the more difficult question is as to the degree of security requisite. This is to be determined in part by settled rules of law and in part through the discretion of the trustee. The Courts have gone no further in limiting the discretion of the trustee than to indicate certain classes of investments as admissible and to reject others as unsuitable. Within the limits of this imperfectly-defined jurisdiction, the trustee has been entrusted with a large discretion and

treated with great liberality, while acting in good faith and charge-able with no culpability or gross imprudence."

In the cases cited by him he indicates the objectionable modes of investment—the loan of trust funds by a trustee to himself; the purchase of real estate with trust funds; the employment of trust funds in trade or in any speculative undertaking without an express authority.

In *Nance* vs. *Nance* the trust funds had been invested in the obligations of individuals without further security. The Court held such investments improper unless the trustee could show that unobjectionable investments could not be procured in the exercise of reasonable diligence, and could prove the necessity and propriety of these investments. This is the full scope of the decision.

After a very elaborate and able examination of our cases on the subject of the investment of trust funds by a trustee, the learned Judge sums up his conclusion in these words: "The trustee will be held responsible for losses of trust funds through loans to private persons unless securities are taken collateral to such loans. Such securities should consist *primarily* of mortgages of unencumbered real estate of a value sufficient to guarantee the debt against all contingencies liable to occur or capable of being foreseen. *Bonds of individuals* should not be taken *in lieu of real securities* unless unobjectionable investments cannot, in the exercise of reasonable diligence, be procured. When *personal securities* are taken *in lieu of real*, it will devolve on the trustee to make the necessity and propriety of such investments to appear upon an accounting with the *cestui que trust*." He contrasts "*bonds of individuals*" with *real securities*, and says that the former must not be taken unless the latter cannot be had. He says that when personal securities are taken in lieu of real, that is when the bonds of individuals are taken in lieu of real securities, the trustee must show the necessity and propriety of such investment. So, in the beginning of his discussion of this question, he quotes Hill on Trustees, p. 380, that if a trustee "finds the estate in his hands to consist wholly or in part of personal obligations, it is his duty to call them in and properly invest the fund." It seems to me that the decision in *Nance* vs. *Nance* goes to this extent and no further. The investment by Nance, the guardian of the funds of his wards, was not in that class of securities which would at once be recognized as proper; nor were they of such a character as would, under our decisions, be at once consid-

ered inadmissible. They were within the limits "of that imper-
fectly-defined jurisdiction in which trustees have been entrusted with
large discretion," and would therefore be examined by the Court in
order to discover whether this discretion was well exercised. When
the guardian could show no necessity for the investment of the
trust funds in personal obligations without other security, he was
held liable for such investment. But when, as in the case of the
Butler note, it appeared that a mortgage of real estate was taken,
beside the personal obligations of individuals, the charge of negli-
gence against the trustee was dismissed, although the security was
imperfect.

In *Cureton* vs. *Wilson*, (3 S. C., 457,) the Court approved and re-
affirm *Nance* vs. *Nance*. In both cases the question arose upon
investments in personal obligations, and such investments were con-
trasted with real estate securities. It would seem, therefore, that
neither of these cases decide that an investment of trust funds upon
bond or other obligation, secured by the pledge or mortgage of per-
sonal property, is a breach of trust.

We will examine the present case.

"The duty of trustees," says Judge Willard, in *Nance* vs. *Nance*,
(1 S. C., 220,) "in relation to investments is defined by the objects
prompting the creation of the trust, namely, to place the fund in a
state of security and in a condition to yield increase. The result-
ing duty is to seek, with reasonable diligence and prudence, invest-
ments affording both security and increase."

The defendant, in order to invest $10,000 of trust funds in his
hands, purchased the bond of Mr. Thomas Milliken, secured by a
second mortgage of a plantation worth between $20,000 and $30,000.
And this bond was also secured by a mortgage of sixty five slaves
in families, worth from $32,500 to $39,000. There was a prior lien
on the plantation of $18,000. The personalty was unencumbered.
I am of the opinion that the mortgage of the realty alone would
have been an improper security.—*Morris* vs. *Wright*, 14 Beav., 291.
Was the mortgage of the personalty such an investment as would
place the fund in a state of security against all contingencies lia-
ble to occur, or which could be foreseen, and would it be in a con-
dition to yield increase?

The bond and mortgages were dated in 1847. At the date of the
purchase of the defendant, in 1853, the interest had been paid in
full to that time. To secure the prompt payment of the interest in

the future he required and procured the additional security of the name of Mr. E. P. Milliken, and the interest continued to be paid to 1865. The security was thus in a condition to yield increase.

Was the fund in a state of security against all contingencies liable to occur or capable of being foreseen ?

The value of the security was over three times the amount of the debt. The security consisted of families of slaves residing on the plantation, increasing steadily in number, and as steadily increasing in value. At the date of the purchase of this security, no one, however opposed to the institution of slavery, dreamed that there was any hope of its speedy extinction or of its abolition, except after conflicts through a long series of years, and then by legislative enactment providing for the compensation of the owner. The war, in fact so near, was anticipated by none but the wisest of the nation, and not even the most wise could foresee or confidently predict its results.

The mortgage held by the defendant vested the legal title of the mortgaged property in him, and his remedy against the mortgagee for a breach of the condition of his bond was short and speedy, easy, inexpensive and safe. Against third persons he had his action of trover, and all the remedies and security afforded him by this form of action. To every appearance, the trust fund was as safe as if it was a first lien on the plantation itself; as safe, because every one supposed that the value of this rice plantation depended altogether on the right to use slave labor ; and more desirable, because the delay and expense of a foreclosure through the Courts was not incident to it. When it is considered that the mortgage of real estate was "added thereto for what it might prove to be worth," it seems impossible to avoid reaching the same conclusion at which the Court, in *Nance* vs. *Nance,* arrived respecting the Butler bond: "The charge of negligence against the trustee on this investment is not sufficiently made out."

We are now prepared to consider the first objection—

That the trustee changed an investment in the loan of the United States, the highest class of securities.

This loan was in the six per cent. stock of the government, was not yet due, and the government offered and paid a premium of nearly twenty-five per cent. upon it.

The rule as stated in *Nance* vs. *Nance* is this :

Trustees are not called upon to obtain for the funds in their hands a greater rate of increase than that which is afforded by the

most secure investments of the country. If they seek to enhance the product of the fund by assuming speculative risks, they do it at their peril. If they take securities of an inferior class while better can be obtained, *without any profit therefor to their cestui que trust,* they clearly disregard the plainest dictates of duty.

In *Cureton* vs. *Wilson,* (3 S. C., *supra,*) it was held a breach of trust to exchange a bond secured by mortgage of realty for a personal note with one security, and to invest the proceeds of that note in Confederate securities, the collection having been made " without any necessity for the immediate use of the money, and without the purpose of obtaining a higher rate of interest, and for no conceivable object having in view any advantage to the ward."

In the present case the loan paid six per cent. per annum on the face of the debt. The government proposed to add nearly one-fourth to the capital if the holder would consent to its redemption. The trustee obtained, as he had every reason to believe, a good investment of ten thousand dollars of the money, at the lawful rate of interest, seven per cent. It does not appear to come within the objections stated in these cases cited.

As a conclusion of law, I find that the defendant is not chargeable for the loss of the investment in the bond of Thomas Milliken.

The defendant excepted to the first report of the Referee on the following grounds:

I. That the conclusions and findings of fact by the Referee, numbered VII, IX, XI, XII, XIII, are erroneous.

(*a.*) That the plaintiff being *sui juris,* and taking and administering as her own the securities which her mother had received in 1865, having her own counsel, not vouching the defendant and not casting them back upon him for seven years or thereabouts, must be assumed to have accepted them, and he is not in any event bound by her administration of them where he was not a party.

(*b.*) That the remainder of the trust fund after 1855, when plaintiff and her mother appropriated $19,347.78 of it, was not $25,170, but $23,087.

(*c.*) That the Earle bond, with mortgage of real estate and personal property of the actual value of $18,000 to secure $5,000, was a good and lawful investment, abundantly well secured at the time of investment, and the loss that has happened—if any need have happened thereon—has not been by reason of any fault, careless-

ness, neglect or error of defendant, but by reason of events over which he had no control and could not foresee and was not bound to foresee.

(d.) That as to the bond of Alfred and Arthur Huger for $2,383, supposed and reported to have been an investment of the trust fund and to have been paid to and received by the defendant in Confederate treasury notes or bonds, said Huger bond, if it ever existed, was no part of the trust estate, the whole trust fund that came into defendant's possession being accounted for otherwise and without such investment.

(e.) That a balance of $512 only was transmuted into Confederate funds by events which he could not control and the consequences of which he is not responsible for.

II. Defendant also excepted to the conclusions of law numbered I to V inclusive, that they are erroneous in law, and mainly so because founded on errors of fact.

III. No loss has occurred by reason of the alleged unaccountable failure to record Earle's mortgage within the statutory time, and a trustee cannot be made liable for more than actual loss happening by his negligence, and especially when only accidental negligence and not bad faith is charged against him.

IV. That the O'Brien judgment did not impair the value of the security taken from Earle, because said judgment was on a bond for less than two-thirds of the purchase money of real estate, and the bond was secured by mortgage of the property itself, worth at the time, and, except for the war, at any and every time since, more than the amount of the judgment, which property was to be first exhausted before the property mortgaged to defendant could be subjected to its execution.

If the defendant may be chargeable at all, it is only for the actual loss suffered in this respect, and not for the depreciation in value of the property caused by the war. Such actual loss has not yet been ascertained by any proceeding to which defendant was a party or had the opportunity to be a party.

The law contemplates and requires from an unfortunate trustee who is the victim of accident, and not of fraud, no more than restoration—compensation for actual loss caused by his mistakes—and not punishment or vindictive damages.

V. That during the war, while the property was depreciating in value, the Courts were closed, and defendant could not enforce and

protect the rights of the trust estate by sale of the property, and he is not chargeable with the effect of stay laws any more than of the war.

VI. That all the circumstances and relations of the parties to one another, as developed by the testimony, create the irresistible presumption that the plaintiff is mistaken; she must have known there had been a trust, and her uncle the trustee of the property of her mother and herself.

That, being *sui juris* in 1855, she joined her mother in the application of a large part of the funds to her own use, and the remainder having been placed, the same year, in the hands of her own agents, in the expectation that she would use a considerable part of it, the presumption is that she knew and recognized, as her mother had done, the discharge of her uncle, when, upon the death of her mother, in 1865, she took, as her mother's and her own, the securities she now seeks to make him liable for.

When she found the securities in the possession of her own agents—Adams & Frost—and thought them her mother's and her own, it is more natural to conclude that her convictions had been impressed upon her ten years before, than that she was misled by her uncle, as seems to be claimed.

VII. It is error of the Referee to assume that the trustee sold the United States bonds in which the $15,000 was invested.

The bonds were paid by the government under the provisions of the law by which they were created.

VIII. If the defendant, misled by the united approval of Mr. Petigru, Mrs. Kinloch and Mrs. Singleton, in 1855, as to his investments, and the continued acquiescence of the two first so long as they lived, and of the plaintiff for seven years after the death of her mother, is, notwithstanding, "to be held liable for the mischances of the fund," then he is entitled to be credited with the commissions (percentage) he is by express law entitled to have, and an account of such commissions should have been stated and reported by the Referee, as claimed by the answer.

The plaintiff excepted to the second report on the ground that the Referee erred in holding that the investment in the bond of Thomas Milliken should be sustained.

His Honor the Circuit Judge overruled the exceptions to the two reports and made a decree confirming the same.

Both parties appealed.

*Simons & Simons,* with whom was *Lord,* for plaintiff.

*Campbells & Whaley,* for defendant.

March 30, 1878. The opinion of the Court was delivered by

WILLARD, C. J. The report of the Referee fully explains the nature of the present case and the facts and circumstances out of which it has arisen. The findings of fact of the Referee will be first considered.

The proposition advanced by the defendant, that the plaintiff had lost her right to call him to account as trustee, and also to dispute the character of certain investments on the ground of acquiescence and laches, is met by a finding of the fact that the plaintiff was not, during the time to which such allegation relates, sufficiently informed of the nature of the trust and of her interest under it to be subject to the charge of acquiescence or of laches. To disturb that finding of fact, we must conclude that it is unsupported by the evidence, either as a fact not proved or as an improper inference from facts proved, or we must conclude that the clear weight of undisputed evidence is against it. We find no ground for such a conclusion. It was incumbent on the defendant to establish facts of that character by clear proof.

The interest of the plaintiff during the lifetime of her mother was that of one in remainder, having no present right to control the fund, directly or indirectly, or to enjoy the income of the trust estate. She had a right to hold her hands off from the estate until her right became vested in interest by the happening of the contingencies on which her right of possession depended. She had no duty to discharge in compelling the trustee to a proper discharge of his duty and keeping him within the strict line of that duty. The duty of keeping the trust estate in a safe condition, so that it might come in due time to the hands of the plaintiff, devolved upon the defendant and not upon the plaintiff. Under such circumstances, very clear evidence of an intention on her part to authorize a clear departure from the terms of the trust would have to be produced to warrant the conclusion contended for by the defendant. It is equally clear that the absence of a defined duty of watchfulness and objection on the part of the plaintiff during the

period of time referred to prevents the application of the principles upon which laches is charged.

The conclusion of the Referee as to this part of the case must be affirmed.

The findings of the Referee were objected to on the ground that he had included in his statement of the assets of the trust estate in the hands of the trustee to be accounted for a bond of A. & A. Huger for $2,283, while it is alleged that no part of the assets went into that bond. The statement of the account made by the Referee is largely derived from memoranda coming from the defendant's custody. These memoranda appear to be necessary in order to state the account of the trustee, as it appears that his books and papers were destroyed through casualties of the late war, and no more direct proof of the accounts being offered by defendants. The character of these memoranda justifies their employment as means of stating the account. Indeed, no objection is made as to their sufficiency as proof of the accounts, but the objection is as it regards the conclusions to be derived from them. We do not find any evidence that the Referee has misinterpreted these proofs or given them undue weight. Certainly the conclusion he has drawn is a fair and reasonable one to derive from the face of the memoranda. The circumstance that the defendant, although a witness in the case on his own behalf, did not give any testimony as to any such objection to the memoranda, affords strong reason to assume that there was no substantial ground of objection to their statements. The fact stated, that length of time had rendered the memory of the defendant indistinct as it regards the state of accounts, cannot help the defendant, for the burden of disputing the representations that appear on the face of the memoranda was upon him. The finding of the Referee as it regards the Huger bond, holding it to have been part of the trust estate to be accounted for, must be sustained.

We find no ground for disturbing the remaining findings of the Referee. We can neither say that they are unsupported by evidence nor that they deny the due force of evidence. It remains to consider the questions of law raised in the findings of the Referee.

We think that the reasoning and conclusion of the Referee as it regards the Earle bond were correct.

It is certainly a breach of trust for a trustee to place trust funds in encumbered property, where it is probable that the trust estate

may be called upon to redeem from such encumbrance and may be seriously embarrassed, if not unable, to effect such redemption. This manifest inconvenience lies at the foundation of the rule stated in *Nance* vs. *Nance*, (1 S. C., 209,) as it regards investing in encumbered property. In the present case the real property mortgaged was affected by the lien of a large judgment. Whether the negroes that constituted part of the mortgage security were subject to the lien of execution on the judgment does not appear. It is said that property sufficient existed, bound by such judgment, without resort to the property mortgaged; but there was no legal means of compelling the judgment creditor to look to any particular fund, bound by his judgment, and, if there was, still the trust estate would be in the position of having purchased a law suit. It is hardly conceivable that circumstances could exist justifying investment by a trustee in property bound by a judgment. It is not enough to justify an investment that the property bound by a security is amply sufficient to meet its obligation. The nature of the security, and the circumstances affecting its availability, must be such as to afford means, consistent with the nature of trust estates, as well as with the circumstances of the particular estate, of obtaining security for the trust fund and reasonable productiveness. As was said in *Nance* vs. *Nance*, the highest rate of productiveness is not required, because ordinarily inconsistent with the requisite security. As to what is a sound investment, in point of availability, is not a question to be determined wholly by the judgment of the trustees as to the degree of risks attending a particular investment, but is determined, in part at least, in accordance with the rules that are the results of general business experience, to some extent recognized as fixed rules of legal administration. Nothing is of greater public importance than that that portion of the stored-up wealth of the community which usually falls into fiduciary custody should be wisely and prudently guarded and employed, not only as securing economic results, but in order to discharge a responsible duty to those who have claims upon the guardianship and protection of the State.

To hold that the investment as to the Earle bond was justifiable would tend to destroy the safeguards surrounding the discharge of fiduciary duties and leave the security of trust estates to the uncertainty of irregular business transactions and to the inaccuracy of speculative authorities.

Other circumstances affecting the value of the investment are stated by the Referee that need not be considered. His conclusion as to the insufficiency of that part of the property not bound by the judgment, and which we find no reason to question, is fatal to the support of the investment.

The Huger bond appears to have been a personal security merely. Such securities are not in themselves admissible, and can only be made so by evidence of the necessity and prudence of such investment.—*Nance* vs. *Nance* and *Allen* vs. *Gaillard*, 1 S. C., 279. No attempt was made by the trustee to explain such unsecured investment. It was no doubt the duty of the trustee to call in such improper investment at the earliest practicable moment.

It is not necessary to consider whether he had the right to convert that bond into Confederate currency, considering that it was inadequately secured, and, on the other hand, that the only medium of effecting such change of securities at the time was Confederate currency.—See *Mayer* vs. *Mordecai*, 1 S. C., 383. Confederate currency was not money, in a legal sense, and, therefore, receiving Confederate currency at a nominal value was not payment in a legal sense. In legal contemplation, Confederate currency was a mere commodity, used by the community as a matter of necessity or convenience as a medium of exchange. In converting a security into Confederate currency the same rules were required to be observed as in case of barter or exchange of one kind of property into another not having the legal character of money—that is to say, regard must be had to its actual value and not to its nominal value. It appears that the Confederate currency was not at the time worth its nominal value, and, therefore, could not properly be taken at such value.

It was, therefore, a clear breach of trust for the trustee to convert the Huger bond into depreciated Confederate currency at its nominal value.—*Mayer* vs. *Mordecai*, 1 S. C., 383; *Sanders* vs. *Rodgers*, 1 S. C., 452; *Womack* vs. *Austin*, 1 S. C., 421; *Cureton* vs. *Wilson*, 3 S. C., 451.

Inasmuch as the trustee both invested in and converted the Huger bond improperly, he is properly chargeable with the value of the assets represented by the security converted at the time of such conversion. It does not appear that any actual value has been derived from the conversion ; accordingly the trustee should stand charged with the amount of that bond.

We are equally satisfied with the conclusion of the Referee as to matters of law as it regards the Milliken bond. His conclusion of fact that the security afforded by that investment was sufficient in point of fact, independent of that portion of the property mortgaged that was subject to prior liens, we are constrained to adopt as subject to none of the objections that are allowed as sufficient to disturb findings of fact. The question of law arises, from this state of facts, whether a mortgage security taken upon slaves is admissible under any circumstances and whether authorized in the case in hand. Slaves at the time constituted an important element of landed securities, at least so far as they were permanently connected with agricultural pursuits. No other kind of personal property stood in like relation to land. While land possessed the value due to the highest indestructibility, slaves had the advantage of increase.

The plantation and its slaves were usually considered together as it regarded the value of agricultural lands. It would be stating the rule with too much attention to technical considerations to lose sight of this fact. The habits and customs of the country must be allowed weight, and it is clear that investments in land and slaves engaged in their culture was regarded as the highest security of a private nature and appropriate and safe for the purposes of security. We are thus constrained to treat the land and the slaves as constituting a single subject of investment in the present case, for in their union lay the element of landed value to which security should look and as substantially a real security.

It appears that one part of the property mortgaged was subject to prior liens, but another part was free from such prior liens, and, by the finding of the Referee, that part not affected by prior liens was sufficient in itself to put the money loaned in a reasonable state of security. The objection of a prior lien in such case does not go to the sufficiency of the security but presents merely a question of technical compliance with the formal requirements of such investments, and as such it must yield to the evidence of substantial compliance with the requisites of good investment.

As it regards the claim for commissions by the trustee, we need not consider the abstract question raised. The defendant came before the Court, in his answer, denying the existence of the trust, and contending that, contrary to the intent of the trust, he had turned over all the assets of the trust estate, many years ago, into

the hands and exclusive control of the life tenant, without regarding the claims of those entitled to take by way of remainder after termination of the life estate. He claims that the trust itself was terminated by that act. This was a clear breach of trust. The defendant claims to have acted since that time as the agent of the life tenant merely—in other words, that he has not acted from the responsibility imposed by the duty of a trustee for that time. It is not a case for the allowance of commissions, assuming that they could be allowed. Such a claim must rest upon the due performance of the duties imposed by the trust, and when these duties are unperformed it is not demandable either at law or in equity. The answer only demands commissions in case the defendant " is held liable for the mischances of the fund." The defendant has not been held liable for " mischances," but for a departure from a clear line of legal duty. No equity exists to extend the demand of the answer beyond its direct sense.

The report of the Referee and the decree of the Court upon it must be affirmed and the cause remanded for further proceedings.

*McIver*, A. J., and *Haskell*, A. J., concurred.